## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| INTERVET, INC., | Civil Action No. 15-1371 (FLW) |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| v. | |
| MILEUTIS, LTD., | |
| Defendant. | |

**BONGIOVANNI, Magistrate Judge**

### I.  Introduction

This matter comes before the Court on Defendant/Counterclaimant Mileutis, Ltd.'s ("Mileutis") Motion for Leave to Amend its Counterclaim.   [Docket Entry No. 32].   Mileutis seeks leave to file its First Amended Counterclaim ("Amended Counterclaim") in accordance with the rulings set forth in the District Court's February 24, 2016 Opinion and Order.   [See Docket Entry Nos. 28 and 29].   Plaintiff Intervet, Inc. ("Intervet") has filed a response in opposition to Mileutis' motion, to which Mileutis replied.   [Docket Entry Nos. 33 and 34].   The Court has fully reviewed and considered all arguments made in support of and in opposition to Mileutis' motion, and considered the motion without oral argument pursuant to L.Civ.R. 78.1(b).   For the reasons set forth below, Mileutis' motion is GRANTED.

### II.  Procedural and Factual Background

Intervet filed the instant declaratory judgment action on February 23, 2015, seeking to clarify its rights under two agreements struck between the parties: (1) a licensing and development agreement for Intervet to develop Mileutis' technology for the prevention and cure of Mastitis and

other illness indications (the "License Agreement"), and (2) a related agreement for funding assistance, for the development of a product for the prevention and cure of bovine Mastitis, with the Israel-United States Binational Industrial Research and Development Foundation ("BIRD") (the "BIRD Agreement," and collectively, the "Agreements").   [See generally Docket Entry No. 1].   Mileutis answered on June 10, 2015, also filing a seven-count Counterclaim against Intervet including claims for consequential damages, namely lost profits.   [Docket Entry No. 8].

On July 10, 2015, Intervet filed a Motion to Dismiss Mileutis' Counterclaim Counts Two through Six [Count Two (Breach of the Covenant of Good Faith and Fair Dealing, "Breach of Covenant"), Count Three (Negligence), Count Four (Gross Negligence), Count Five (Trade Libel), Count Six (Tortious Interference with Prospective Economic Relations, "Tortious Interference")], and claims for consequential damages.   [Docket Entry No. 15].   On February 24, 2016 the District Court ruled on same, dismissing counts Three and Four *with prejudice*; dismissing counts Two, Five, and Six *without prejudice*; and upholding the claims for consequential damages.   [See Docket Entry No(s). 28 and 29].   The District Court's Opinion set forth the elements of the claims It had dismissed without prejudice so Mileutis could support same with additional facts.   [Docket Entry No. 29].

Soon thereafter, on March 2, 2016, the Court entered a Stipulation and Consent Order setting forth a briefing schedule for the filing of Mileutis' Amended Counterclaim.   [Docket Entry No. 31].   Mileutis now seeks leave to file its Amended Counterclaim to make the following changes in conformance with the District Court's Opinion: (1) removing former-Count Three (Negligence) and former-Count Four (Gross Negligence); (2) revising and adding factual allegations in support of Count Two (Breach of Covenant), Count Three (Trade Libel), and Count Four (Tortious Interference).   [See generally Docket Entry 32-3].

2

### III. Analysis

#### a. Standard of Review

Federal Rule of Civil Procedure 15(a) governs requests for leave to amend, allowing an amendment either through the court's leave, or through obtaining the opposing party's written consent. *Smith v. Honeywell Int'l, Inc.*, No. 10-CV-03345-ES-JAD, 2014 WL 301031, at *11 (D.N.J. Jan. 27, 2014). While courts have broad discretion to decide motions to amend, they are to "heed Rule 15(a)'s mandate that amendments are to be granted freely in the interests of justice." *Voilas v. General Motors Corp.,* 173 F.R.D. 389, 396 (D.N.J. 1997) (internal citations and quotations omitted); see also *Wright & Miller* § 1484, at 676 ("Subdivision (a)(2) encourages the court to look favorably on requests to amend."). This ensures that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.,* 92 F.2d 484, 487 (3d Cir. 1990) (internal citation omitted); see also *Sabatino v. Union Township,* No., 2013 WL 1622306, at *6 (D.N.J. April 15, 2013) (internal citations omitted) (discussing that "if the underlying facts relied upon by a party might be a proper subject of relief, that party should have the opportunity to test its claims on the merits."). The decision to grant or deny leave to amend under Rule 15(a) is "committed to the sound discretion of the district court." *Arab African Int'l Bank v. Epstein,* 10 F.3d 168, 174 (3d Cir. 1993). In the absence of unfair prejudice, futility of amendment, undue delay, bad faith, or dilatory motive, the court must grant a request for leave to amend. *Grayson v. Mayview State Hosp.,* 292 F.3d 103, 108 (3d Cir. 2002).

In determining whether a proposed amendment is futile, "the court looks only to the pleadings." *Pharmaceutical Sales & Consulting Corp. v. J.W.S. Delavau Co.*, 106 F.Supp.2d 761, 765 (D.N.J. 2000). A proposed amendment is futile if it "would fail to state a claim upon which relief could be granted." *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). In assessing

'futility' the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Id*. When faced with a motion to dismiss for failure to state a claim, the court conducts a two-step analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the factual elements are separated from the legal elements of the claim. *Id*. at 210-11. The court must accept the factual elements alleged in the well-pleaded complaint as true, but may disregard any legal conclusions. *Id*. Second, the court must decide if the facts alleged are sufficient to show a "plausible claim for relief." *Id*. at 210 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft*, 556 U.S. at 679.

### 1. Tortious Interference

The Court will first address the amendments pertaining to Mileutis' Amended Count Four (Tortious Interference). Under New Jersey law, a Tortious Interference claim has five elements: (1) a plaintiff's [...] reasonable expectation of economic benefit or advantage; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and (5) damages resulting from the defendant's interference. *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993) (internal citations omitted). A complaint based on Tortious Interference must allege facts that show some protectable right - a prospective economic or contractual relationship. *Id*. (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751 (1989)). Specifically, "a complaint must demonstrate that a plaintiff was in 'pursuit' of business." *Id*. Second, the complaint must allege facts claiming that the interference was done "intentionally and with 'malice.'" *Id*. Additionally,

a plaintiff does not need to show actual loss of a contract, only that but for the defendant's interference, there was a reasonable probability that the plaintiff would have received the economic benefit. *Mu Sigma, Inc. v. Affine, Inc.,* No. CIV.A. 12-1323 FLW, 2013 WL 3772724, at *3 (D.N.J. July 17, 2013); (citing *Harris v. Perl,* 41 N.J. 455, 492 (1964)). "However, mere hope that the plaintiff would have entered into some future arraignment with the prospective customer is not sufficient." *Id*. at *3; (citing *Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 184 (3d Cir. 1997)).

In deciding Intervet's motion to dismiss Mileutis' Counterclaim, the District Court's Opinion found Mileutis had successfully pled all but the first element of the tort, namely Mileutis did not have a reasonable prospective economic advantage, because:

> […] the assertion that Plaintiff prevented Defendant 'from raising the necessary funds to develop any new products,' CC ¶¶ 137, 184, which, in turn, would require successful development and regulatory approval before any economic advantage could be realized; that allegation of economic benefit is simply too speculative to qualify as a reasonable expectation.

> [Docket Entry No. 28 at 16].

Mileutis argues they have now adequately pled the first element of the tort because, contrary to the District Court's Opinion, which defined a reasonable economic benefit as sales, Mileutis' reasonable economic benefit was obtaining research and development contracts with investors. [Docket Entry No. 32-1 at 14-16]. In this regard, paragraphs 142-154 of Mileutis' Amended Counterclaim now allege that specific investors including, for example: an animal health company and one of its shareholders, a businessman and investor, and a U.S.-based animal health corporation, decided, sometimes abruptly, not to enter into collaborative research & development, or investment, contracts with Mileutis because of Intervet's tortious conduct. [*Id*. at 14-16; see

also Docket Entry 32-3 at ¶¶ 142-154].[1]  Said contracts were withdrawn because Intervet knowingly and falsely advised the Mileutis' investors that Mileutis' Technology did not work and/or that Intervet owned Mileutis's Technology.    [*Id.*].

Intervet in response argues that Mileutis' Count Four remains futile because in essence, Mileutis has not addressed the District Court's finding that no reasonable economic benefit could be realized, as Mileutis would have sill have to successfully develop another uterine treatment and obtain regulatory approval before Mileutis could begin receiving an economic advantage, i.e. a profit.   [Docket Entry No. 33 at 4; citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 186 (3rd Cir. 1992)].

Taking all of the allegations in the Complaint as true, as this Court must when evaluating a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court finds that Mileutis has sufficiently alleged a reasonable expectation of economic benefit or advantage. Although the Court does not address the *de novo* question of whether research & development, and/or investor contracts constitute a *per se* reasonable expectation of economic benefit; all required is: "[a] Complaint […] demonstrate that the plaintiff was in 'pursuit of business.'"   *Printing Mart–Morristown*, 116 N.J. at 751.   Here, Mileutis has alleged it was in "pursuit of business," and had a reasonable expectation that it would secure its valuable investment contracts. Specifically, in paragraphs 146-150 of its Amended Counterclaim, Mileutis alleges that between March and June of 2014, Mileutis negotiated with the shareholder of an animal health company, discussing both investment amounts and the utilization of the animal health company's manufacturing resources.   [Docket Entry 32-3 at ¶¶ 146-48].   A meeting to finalize the contract was planned for August of 2014, until in or

---

[1]  Mileutis states that because the identities of these entities are confidential, it will provide said names during discovery under the protection of a confidentiality order.

about June of 2014, when the shareholder cancelled any subsequent negotiations after a former Intervet employee, now working for the same animal health company, contacted Intervet and was told by Intervet that it had lost millions of dollars in investments on Mileutis' ineffective technology.  [*Id*. at ¶¶ 149-50].

These allegations, if true, establish that Mileutis was in the process of securing an investor contract; Intervet was made aware of Mileutis' pursuit of same; Intervet made allegedly false statements to the investor; which apparently caused the investor to withdraw his business from Mileutis, unfairly interfering with Mileutis' pursuit of said business. The Court need not determine whether Intervet's statements were in fact false, only whether if true, they give rise to a plausible claim for relief. From these facts it is plausible that Mileutis would have secured the investor contract at the close of the "final meeting," but for the alleged interference of Intervet.  See *Printing Mart–Morristown*, 563 A.2d at 37; see also *Fineman*, 980 F.2d at 186. ("New Jersey law requires that a plaintiff alleging tortious interference with existing or prospective advantage present proof that but for the acts of the defendant, the plaintiff "would have received the anticipated economic benefits.").  Consequently, the Court finds Mileutis' has pled the first element of a Tortious Interference claim, and therefore Mileutis' Count Four is not futile.

### 2.  Trade Libel

Mileutis' Count Three (Trade Libel) is likewise no longer futile as Mileutis has plead the special damages required to state a Trade Libel claim.   Under New Jersey Law, a claim for Trade Libel requires "(1) publication (2) with malice (3) of false allegations concerning plaintiff's property or product (4) causing special damages, i.e., pecuniary harm."   *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1140 (3d Cir. 1977).   "[Trade Libel] is […] probably as broad as any injurious falsehood which disturbs prospective advantage." *Id.* Notably,

7

"[a] plaintiff alleging trade libel must prove publication of a matter derogatory to the plaintiff's property or business, of a kind designed to prevent others from dealing with him or otherwise to interfere with plaintiff's relations with others." *Patel v. Soriano*, 369 N.J. Super. 192, 248-49 (App. Div. 2004); (quoting *Prosser & Keeton on Torts* § 128 at 967 (5th ed. 1984)). "The communication must be made to a third person and must play a material part in *inducing others not to deal with plaintiff*." *Id*. (emphasis added).

Similarly, "[u]nlike ordinary defamation actions, an action for [trade libel] requires special damage in all cases . . . . [and] because this cause of action is designed to protect the economic interests of a vendor, the plaintiff must plead and prove special damages with particularity." *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004). "[T]he need to prove such special damages requires that Plaintiffs allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication. *Id*. Further, "the special damages requirement goes to the cause of action itself, such that a plaintiff will be denied even nominal or punitive damages if he cannot show special damages." *Patel*, 369 N.J. Super. at 249; citing *Prosser & Keeton* § 128 at 970–71. "[I]f predicating its claim on a general diminution in business, plaintiff should . . . allege[] facts showing an established business, the amount of sales for a substantial period preceding the publication, the amount of sales for a [period] subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication, and facts showing the plaintiff could not allege the names of particular customers who withdrew or withheld their custom." *Mayflower,* 314 F. Supp. 2d at. 378 (citations and internal quotation marks omitted). If predicating a claim on the loss of particular customers, "[t]he necessary showing is specific: [a] plaintiff must establish pecuniary loss that has been realized or

8

liquidated, such as lost sales, or the loss of prospective contracts with customers."  *Patel* 369 N.J. Super. at 249; citing *Prosser & Keeton* § 128 at 972-73.   "Traditionally, a plaintiff was required to identify particular *business interests* who have refrained from dealing with him, or explain the impossibility of doing so."  *Id.*; citing *Prosser & Keeton* § 128 at 973 (emphasis added).

Here, the District Court found Mileutis' Counterclaim failed to plead the facts necessary to support a Trade Libel claim based on a "general diminution" of its business, because Mileutis' only paragraph in support of same, former paragraph 180, "merely avers generally that '[a]s a direct and proximate results of the trade libel of [Intervet], [Mileutis] has incurred and will continue to suffer damages."   [See Docket Entry No. 28 at 11-12].

Mileutis contends that its Amended Counterclaim adequately addresses the District Court's concerns.   Specifically, Mileutis argues, as a research-and-development company, it relies upon investors, and that as a result of Intervet's falsely telling investors that Mileutis' Technology does not work, or that Intervet owned Mileutis' Technology, Mileutis lost potential investors.[Docket Entry No. 32-1 at 12-14.; see also Docket Entry No. 32-3 at ¶¶ 138-154].   Mileutis argues it has plead special damages by (1) identifying investors Mileutis lost due to Intervet's trade libel, and/or (2) by demonstrating Mileutis suffered a "general diminution of business," *i.e.*, showing that a reduction of established sales was the probable and natural result of the publication, and that Mileutis cannot allege the names of particular lost customers.[2]   [*Id.*; citing *Mayflower Transit,* 314 F.Supp.2d 378 (D.N.J. 2004)].

Intervet responds arguing same is likewise futile because Mileutis' paragraphs 138-154 of its Amended Counterclaim only allege lost investors, and not the lost "[customer] profits" required

---

[2]  Mileutis likewise states that because its commercial discussions are confidential, it will also provide the specific names of the companies/persons referenced during discovery under the protection of a confidentiality order.

to establish a "pecuniary loss that has been realized or liquidated, such as lost sales, or the loss of prospective contracts with customers."    [Docket Entry No. 33 at 7*; citing *Patel*, 369 N.J. Super. at 248-49].    Intervet argues Mileutis cannot realize a customer profit as Mileutis would still have had to successfully develop a product and receive regulatory approval before sales, and thus profits, could result.    [*Id*.; see also *Patel*, 369 N.J. Super. at 248-49].

Intervet reads *Patel* as requiring Mileutis to plead "liquidated damages" meaning lost customer sales *viz*. profits. The Court disagrees.   In *Patel*, "[a] pecuniary loss […] that has been realized or liquidated, such as lost sales […]" was prefaced by the words "such as," indicating lost sales are but one of many different types of special damages required support a claim of trade libel. *Id*. at 248.   Loss of investor income may therefore qualify as pecuniary loss.    Mileutis will have adequately pled special damages if it can demonstrate Intervet's alleged statements contributed to the deprivation of a valuable, and non-speculative economic benefit, regardless of what form the benefit takes. Therefore, the Court finds that paragraphs 138-154 of Mileutis' Amended Counterclaim alleging that Intervet's conduct has deprived Mileutis of a business interest, namely the investor contracts, is sufficient.   The Court finds Mileutis' Trade Libel claim is adequately pled, and is thus not futile.

### 3.   Breach of Covenant of Good Faith and Fair Dealing

Under New Jersey law, every contract includes an implied covenant of good faith and fair dealing.   *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp*., 228 F.3d 275, 288 (3d Cir. 2000). This covenant is independent of the duty to perform the express terms of the contract, and may be breached without a violation of the contract terms.   *Sons of Thunder, Inc. v. Borden*, 148 N.J. 396, 423 (1997).   There are "myriad forms of conduct that may constitute a violation of the covenant of good faith and fair dealing."   *Brunswick Hills Racquet Club, Inc. v. Route 18*

*Shopping Ctr. Associates*, 182 N.J. 210, 225 (2005).   For that reason, "[e]ach case is fact-sensitive."   *Id.*   The covenant requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Wade v. Kessler Inst.*, 172 N.J. 327, 340 (2002) (quoting *Bak A-Lum Corp. v. Alcoa Bldg. Prods., Inc.*, 69 N.J. 123, 129-30 (1976)) (internal punctuation omitted). Thus, one party cannot abide by the literal terms of a contract while maliciously denying the other party the benefits that he would reasonably expect under the contract.   See *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 170 (3d Cir. 2001); *Wilson,* 168 N.J. at 250.

A party's exercise of discretion is tempered by the covenant of good faith and fair dealing. *Id.*   In the context of contracts that "vest[ ] 'unilateral discretion ... in one party' — 'whether to fix a price, to order a quantity of goods,' or to control 'other conditional aspects of a contract;' '[t]he fact that a discretion-exercising party causes the dependent party to lose some or all of its anticipated benefit from the contract [...] is insufficient to establish a breach of contract by failing to perform in good faith [...] [t]he dependent party must instead allege] *bad motive* in order to assert successfully a claim of breach of the implied covenant of good faith and fair dealing. *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 518 (D.N.J. 2009), aff'd, 374 F. App'x 341 (3d Cir. 2010); citing *Wilson*, 168 N.J. at 245–46, 249 (citations omitted, emphasis added).

However, no matter what form the alleged Breach of Covenant takes, "[t]o state a claim for breach of the implied covenant of good faith and fair dealing a contracting party must allege that the accused acted in bad faith or engaged in 'some other form of inequitable conduct in the performance of a contractual obligation.'" *Pactiv Corp. v. Perk-Up, Inc.*, No. 08-5072, 2009 U.S. Dist. LEXIS 72796, at *34 (D.N.J. Aug. 18, 2009) (quoting *Black Horse*, 228 F.3d at 289); see also *Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 U.S. Dist. LEXIS 32584, at *31 (D.N.J.

Mar. 31, 2010) ("Under New Jersey law, a claim for breach of the duty of good faith and fair dealing requires a showing of "bad motive or intention," though at the pleading stage all that is required is an allegation of bad faith.") (citing *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 263 (App. Div. 2002)) (citation omitted).

The District Court found Mileutis' counterclaim failed to adequately plead the facts necessary to allege a Breach of Covenant claim because "Mileutis' allegations of 'bad faith' relate to actions that Mileutis also claim[ed] form the basis of its breach of contract counterclaim." [Docket Entry No. 28 at 9-11; comparing Docket Entry No. 8 ¶¶ 56, 163 (alleging Plaintiff acted in bad faith by not promoting project, obtaining permits, and developing product, "thereby breaching its fundamental obligations under, as well as the spirit of, the Agreements and the implied covenant of good faith and fair dealing therein,") and ¶ 162 (alleging Plaintiff acted in bad faith by failing to "provide quality research and development in a timely, competent, ethical and professional manner" and "concealed critical information,"), with ¶ 158 (alleging breach of contract based on Plaintiff's "not performing, and/or performing in a substandard manner, scientific studies and tasks, […] failing to assign knowledgeable and ethical employees to the required tasks, and failing to communicate with Mileutis about the status of critical information necessary to fulfill the requirements of the Agreements.")].

Mileutis in turn argues a Plaintiff can plead a Breach of Covenant claim in three circumstances: (1) to imply terms not expressly included in the contract, but the parties understand are included as necessary to provide business efficacy to the contract (see *N.J. Bank v. Palladino*, 77 N.J. 33, 46 (1978)); (2) to remedy a party's bad faith performance, although that party has not breached an express term of an agreement (see *Sons of Thunder,* 148 N.J. at 418); and (3) to examine a party's exercise of discretion where it is expressly granted under a contract's term(s)

(see *Wilson*, 168 N.J. at 250).   [Docket Entry No. 32-1 at 5-6.]   Mileutis argues it has

differentiated said claim's factual allegations from the "duplicative" breach of contract factual

allegations, and the revised facts demonstrate Intervet breached the covenant of good faith and fair

dealing in each of these three respects.   [*Id*.; citing Docket Entry No. 28 at 7-9].

For example, Mileutis alleges in paragraph 19 and 20 of its Amended Counterclaim that

"Intervet frustrated the purpose of the Agreements by never intending to fulfill the terms of the

BIRD Agreement" and, "Intervet never intended to develop all indications licensed to them."

[Docket Entry No. 32-1 at 7-9; see also Docket Entry No. 32-3 at ¶¶ 31-39, 50-53, 68-76, 79-80,

94-95, 100-103, 104, 112-115, 121-122, 135-138, 141-144, 165].   Mileutis also argues their

revised facts demonstrate Intervet breached the covenant of good faith and fair dealing when

exercising the discretion afforded to it under the Agreements.   [Docket Entry No. 32-1 at 9-12].

Mileutis claims Section 8.06 of the License Agreement granted Intervet discretion for certain tasks.

[*Id*.].   Section 8.06, entitled "Additional Obligations of Schering [Intervet]" states:

8.06   Additional Obligations of [Intervet]. [Intervet] hereby agrees that, pursuant to the license
grant set forth in Section 3.01 hereof, it shall:

(a) use all reasonable, diligent efforts, consistent with the usual commercial practice
to obtain Permits for the Products in each country of the Territory;

(b) use all reasonable, diligent efforts, consistent with the usual commercial practice
in pursuing the manufacture, marketing, sale, and supply of similar products, in order to
commercialize the Products in the Territory in all material respects consistent with the terms of
the Development Plan;

(c) comply with all Applicable Laws of Governmental Authorities relating to the
manufacture, marketing, sale, and supply of the Products;

(d) not, in any way, pledge or purport to pledge Company's credit, accept any order
to make any contract binding upon Company, or give, purport to give, or make any warranty or
representation on behalf of Company;

(e) use its best endeavors to ensure that the manufacture, marketing, sale, or supply
of the Products does not involve an unauthorized use of the intellectual property rights of any

13

Person;

        (f) in considering the procurement of a manufacturing partner to process and/or manufacture the Products, offer to Company the opportunity to bid on such process; provided, however, that Company shall demonstrate, to the satisfaction of Schering, its resources and technological capabilities in undertaking such endeavor.

[Docket Entry No. 21-2; *Exhibit A to Intervet's Mot. to Dismiss Mileutis Counterclaims, License Agreement,* at 22-23].

Mileutis claims it is under this section of the License Agreement that Intervet's discretionary actions breached the covenant of good faith and fair dealing by, for example: "assigning to the Joint Advisory Board ("JAB") an individual who had no knowledge of the project, voiced his disinterest in participating in JAB, and caused delays in the project due to Mileutis having to explain the project in great detail to this uninterested Intervet representative, and refused to perform tasks assigned to him."   [Docket Entry No. 32-1 at 9-12; citing Docket Entry No. 21-2 at 22-23, and Docket Entry No. 32-3 at ¶ 38, respectively; accord ¶¶ 48, 55-56, 70-71, 83, 88, 95, 98-99, 104, 107-108, 110-114, 117-118, 120-121, 176].

Intervet raises three arguments in opposition to Mileutis' Breach of Covenant claim: (1) Mileutis' revised factual allegations are not Breach of Covenant allegations, but are in fact the same breach of contract allegations that were dismissed as duplicative by the District Court; (2) the covenant of good faith and fair dealing does not require parties to behave altruistically and therefore did not oblige Intervet to perform outside of its obligations under the contract; and (3) Intervet's allegedly false and disparaging statements are too speculative to support a Breach of Covenant claim.   [Docket Entry No. 33 at 11-14].

Regarding Intervet's first argument; Intervet argues Mileutis' conflated factual allegations fall into two categories: (1) factual allegations about Intervet's performance of the License Agreement in general; and (2) factual allegations about Intervet's failure to properly perform the

14

U.S. Clinical Study. As to the first category, Intervet cites five of Mileutis' factual allegations

namely that:

- "Intervet prevented the creation of a Development Plan under the License Agreement
  by assigning a succession of reluctant and unqualified individuals to the Joint Advisory
  Board,"   [*Id*. at 12 citing Docket Entry No. 32-3 at ¶¶ 38, 39].
- "[Intervet] arbitrarily and unreasonably failed to make diligent efforts consistent with
  the usual commercial practices for obtaining permits, developing and manufacturing
  the Product,"   [*Id*. citing Docket Entry No. 32-3 at ¶¶ 55-56, 176].
- "[Intervet] caused delays in research and development."   [*Id*. citing Docket Entry No.
  32-3 at 31-39, 50-53, 68-76, 94-95, 112-115, 138, 165].
- "[Intervet] failed to correct errors brought to its attention during the term of the
  Agreements."   [*Id*. citing Docket Entry No. 32-3 at ¶¶ 104, 121-122].
- "[Intervet] acknowledged that it made material and fundamental mistakes in the process
  of developing the Product due to its unilateral decision to assign unknowledgeable
  individuals to the project."   [*Id*. citing Docket Entry No. 32-3 at ¶ 103].

As to the second category, Intervet cites nine examples factual allegations in Mileutis'

Counterclaim; for example:

- "[Intervet] decided to test an inadequate number of cows and assigned personnel
  lacking the necessary experience and education to properly conduct testing, resulting
  in statistically insignificant and useless results."   [*Id*. citing Docket Entry No. 32-3 at
  ¶¶ 70-71, 107-108, 110-114, 117-118; see also Docket Entry No. 33, at 13-14; citing
  Docket Entry No. 32-3 at ¶¶ 31-39, 48, 79-80, 83, 88, 107-108, 110-111, 117-118.].

Intervet argues, as noted by the District Court's opinion, the allegations claiming "Intervet

was not performing, and/or performing in a substandard manner, scientific studies and tasks, . . .

failing to assign knowledgeable and ethical employees to the required tasks, and failing to

communicate with Mileutis about the status of critical information necessary to fulfill the

requirements of the Agreements," is Mileutis trying to have it both ways as said allegations are

either respectively breaches of § 8.06, Milestones 2, 3, 4, and exhibit C of the License Agreement,

or a breach of the implied covenant of good faith and fair dealing.   [*Id.*; citing *Adler Eng'rs, Inc.*

*v. Dranoff Props., Inc*., No. 14-cv-921, 2014 WL 5475189, at *11 (D.N.J. Oct. 29, 2014)); see also

*Hahn v. OnBoard LLC*, No. 09-cv-03639, 2009 WL 4508580, at *6 (D.N.J. Nov. 16, 2009)].

Therefore, because Mileutis' proposed amendments recite conduct that breaches provisions in the License Agreement, the Court should deny Mileutis' application to reassert the bad faith claims listed above.

Similarly, Intervet argues the covenant of good faith and fair dealing does not require parties to act altruistically.   [*Id.* at 11].   As such, Mileutis allegations about "[Intervet's] refus[al] to present at a forum supported by the U.S. and Israeli governments on the topic of the development of this non-antibiotic technology. . . ." and "[Intervet's] unilateral[] [pursuit] [of] work on the Product outside of the U.S." are futile.   [*Id.*].   Neither were required under the Agreements, and Mileutis cannot use a bad faith claim to impose additional, uncontemplated obligations on Intervet.   [*Id.*].   Moreover, Mileutis does not allege that the failure to present information at same denied Mileutis the benefit of its bargain under the License Agreement.   [*Id.* at 13; citing Docket Entry No. 32-3 at ¶¶ 51-53, 95; also citing *Brunswick Hills Racquet Club, Inc.,* 182 N.J. at 231 ("[c]ontract law does not require parties to behave altruistically toward each other.")].

Intervet also argues that Mileutis' amended factual allegations about two "false and disparaging statements," that Intervet purportedly made i.e., (1) that prospective investors told Mileutis that they "could not invest in Mileutis' product because the Technology was too similar to what [Intervet] was developing," [Docket Entry No. 32-3 at ¶ 143] and; (2) that an investor who, after declining to invest in an unspecified Mileutis product, commented that "[Intervet] '[was] not taking the project seriously,'" [Docket Entry No. 32-3 at ¶ 144] are both futile as neither statement is plausible to support a Breach of Covenant claim.   [Docket Entry No. 33; at 15-16].

Regarding Mileutis' first statement, Intervet argues the factual allegations do not support a Breach of Covenant claim as the statements were in fact true, and do not demonstrate Mileutis was

16

denied the benefit of its bargain.   [*Id.*].   Specifically, under the License Agreement, Mileutis had granted a licensed to Intervet.   [*Id.* at 15; citing Docket Entry no. 32-3 at ¶ 20-21].   This license allowed Intervet to use Mileutis' "technology related to casein … formulations[,] for intramammary use in cattle […] and products derived from Mileutis' intellectual property rights, including products for *intrammamary treatment of Mastitis* in cattle."   [*Id.* citing Docket Entry no. 32-3 at ¶ 20-21 (emphasis added)].   After Intervet declined to invest in a new potential project, Mileutis sought partners to develop its technology for a separate condition — *uterine infections*, and was rebuffed, as the investors claimed the proposed technology was too similar to what Intervet was developing.   [*Id.* at 16; citing Docket Entry No. 32-3 at ¶¶ 125, 127, 143].   As Mileutis had granted Intervet a license to use Mileutis' technology, and Intervet was using that license to develop a different, albeit related product to Mileutis' proposed product, the factual allegations at issue are true and are not the result of a misstatement by Intervet.   [*Id.* at 16-17].   Similarly, even if a would-be investor were incorrectly led to believe that Intervet "owned" the technology (rather than "licensed" it), there is no reason to conclude that that difference could have affected their decision-making.   [*Id.*].

Regarding the second statement, the efficacy of the technology at issue; Intervet argues that Mileutis' amended factual allegations are futile because they speculate that the investor must have "conducted its due diligence" and contacted Intervet; and that Intervet must have "made false and disparaging statements and allegations about the efficacy of Mileutis' Technology."   [*Id.* at 18].   Intervet argues these inferences, based on the investor's comments, are a bridge too far as the investor's comment—that Intervet "[was] not taking the project seriously"—does not, by itself, support a reasonable inference that Intervet made false and disparaging statements about Mileutis' technology.   [*Id.*; citing Docket Entry No. 32-3 at ¶ 144 ].   The investor's comment could have

17

resulted from the length of Intervet's and Mileutis' collaborations, without a return on investment, or the fact that Intervet had decided to develop the technology for one medical condition, allowing other investors to develop the technology for other indications.   [*Id*.].

Lastly, Mileutis' revised factual allegations that "[Intervet] surreptitiously sought to develop a product in competition with Mileutis' uterine infection product," are futile as Mileutis does not plead Intervet's misconduct denied Mileutis the benefit of its bargain under the License agreement.   [*Id*. at 19; citing Docket Entry 32-3 at ¶¶ 135-138].   Here, Intervet argues that while Mileutis alleges Intervet was "seeking to develop an alternative treatment for uterine infections with a third party [...]," Mileutis fails to plead that the License Agreement barred Intervet from developing multiple products at once, even competing products.   [*Id*.; citing Docket Entry No. 32-3 at ¶ 138].   Intervet argues §8.08 of the License Agreement, which states in relevant part: "[n]othing herein shall be construed to limit Schering's [now Intervet's] ability to develop, market, sell, or otherwise commercialize, directly or indirectly, any product that competes with the Products; provided that such product is not derived from the Company Intellectual Property Rights," in fact expressly allowed Intervet to develop competing products.   [*Id*.; citing Docket Entry No. 16, *Intervet Notice of Mot. to Dismiss, Ex. A., "License Agreement"*].   Thus, even accepting Mileutis' allegations as true for the purpose of this motion, Mileutis does not plead facts showing that Intervet's alleged concurrent development of another product to treat uterine infections denied Mileutis the benefit of its bargain under the License Agreement.   [*Id*.]

Construing Mileutis' amendments liberally, the Court finds that Mileutis has plead sufficient factual matter to differentiate its Breach of Covenant allegations from its breach of contract allegations, and it now alleges a non-futile Breach of Covenant claim. Even accepting as true Intervet's argument that *most* of the allegations supporting Mileutis' Breach of Covenant

18

claim are, in fact, allegations in support of its breach of contract claim, Mileutis has still successfully plead a separate Breach of Covenant claim by plausibly alleging Intervet failed to exercise the discretion afforded to it under various portions of the parties' Agreements, in good faith, and in line with the Mileutis' reasonable expectations.

Although Intervet argues Mileutis' Amended Counterclaim ¶ 171, which states Intervet's "not performing, and/or performing in a substandard manner, scientific studies and tasks, . . . failing to assign knowledgeable and ethical employees to the required tasks, and failing to communicate with Mileutis about the status of critical information necessary to fulfill the requirements of the Agreements," demonstrates Mileutis is seeking to impermissibly plead alternative Breach of Covenant and breach of contract claims, the Court disagrees.

The Court believes the complained-of conduct contained in Mileutis' factual allegations reasonably falls between the gaps of the Agreements' express provisions, simply by omission, or because it was an activity contemplated as best left to the discretion of a party, assuming that party would exercise its discretion in good faith.    [See Docket Entry No. 32-3 at ¶ 38-39 (that pursuant to the Proposals, Intervet assigned to JAB an individual who had no knowledge of the project, voiced his disinterest in participating in JAB, and caused delays in the project due to Mileutis having to explain the project in great detail to this uninterested Intervet representative, and refused to perform tasks assigned to him); ¶¶ 55-56, 176 (Intervet arbitrarily and unreasonably failed to make diligent efforts consistent with the usual commercial practices for obtaining permits, developing and manufacturing the Product and later sought to obfuscate these failures from Mileutis); ¶¶ 70-71, 77-81, 107-108, 110-114, 117-118 (despite a lack of required specific number of cows for testing under Milestones 2, 3, and 4, Exhibit C of the License Agreement, Intervet decided to test an inadequate number of cows and assigned personnel lacking the necessary

experience and education to properly conduct testing, resulting in statistically insignificant and useless results; Intervet also failed to test an adequate number of specific pathogens; Intervet also conducted unilateral testing, thereby causing delays)].

Likewise, although Intervet claims the implied covenant of good faith and fair dealing does not mandate altruism, the conduct for which Mileutis' reasonably expected Intervet to perform was not over and above the spirit of the Agreements. Aside from "[Intervet's] refus[al] to present at a forum supported by the U.S. and Israeli governments on the topic of the development of this non-antibiotic technology. . . .", which Mileutis admits was never a part of either Agreement; the Court believes Mileutis' allegations regarding Intervet's bad-faith performance of its obligations under the Agreements, plausibly demonstrates a pattern of misconduct that injured Mileutis' right to receive the benefit of the bargain under the Agreements. For example, Intervet's alleged bad faith obstinateness in "failing to communicate with Mileutis after Mileutis raised this issue [of Intervet's inadequate testing protocol] to [Intervet]," and "[despite] ignor[ing] Mileutis' requests to correct the protocol, Mileutis again advised [Intervet] to correct the protocol for the U.S. Clinical Study. [Intervet] however, continued to largely ignore Mileutis' suggestions [...]," do not necessarily rest on a breach of the Agreements by Intervet, but rather on Mileutis' expectation that Intervet would perform under the Agreements in a way that did not injure Mileutis' right to receive its unfettered benefit of the bargain, regardless of whether the parties' standards of conduct were governed by express provisions of the Agreements.   [See Docket Entry No. 32-3 at ¶ 88-91].

Therefore, drawing all inferences in favor of Mileutis, the Court finds that these allegations are sufficient to state a distinct claim for a breach of the implied covenant of good faith and fair dealing. Consequently, the Court will grant Mileutis' Motion for Leave to Amend its Counterclaim.

**Conclusions**

Therefore, for the reasons stated above, and for good cause shown:

IT IS on this 17th day of August, 2016

1.      ORDERED that Mileutis' motion to amend is GRANTED; and it is further

2.      ORDERED that Mileutis shall file its Amended Counterclaim within 10 days of the date

of this Order; and it is further

3.      ORDERED that the Clerk of the Court shall terminate the aforementioned motion

[Docket Entry No. 32].


                                    _____/s/ Tonianne J. Bongiovanni_____
                                    **HONORABLE TONIANNE J. BONGIOVANNI**
                                    **UNITED STATES MAGISTRATE JUDGE**