**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

INTERVET, INC.,

        **Plaintiff,**

     **v.**

MILEUTIS LTD.,

        **Defendant.**

Civil Action No. 15-1371 (ZNQ)

**MEMORANDUM OPINION AND
ORDER**

Pending before the Court is Plaintiff Intervet, Inc.'s ("Plaintiff" or "Intervet") Motion to Strike Errata (Docket Entry No. 139) to the Deposition of Dr. Panayiotis Constantinides. Defendant Mileutis Ltd. ("Mileutis" or "Defendant") filed an opposition to the Motion (Docket Entry No. 146), and Plaintiff replied.  (Docket Entry No. 147).  Oral argument was held on December 15, 2022.  (Docket Entry No. 153.)  Following oral argument, the parties submitted supplemental briefs.  (Docket Entry Nos. 158, 161, 170, & 171.)  For the reasons that follow, Plaintiff's Motion to Strike will be **GRANTED** in part and **DENIED** in part.

## I.  BACKGROUND

The Court presumes a familiarity with the nature and history of this litigation.  As a result, not all factual details leading to the filing of this case are recited herein.  Instead, the Court focuses on the facts most relevant to the pending Motion.

Plaintiff commenced this action on February 23, 2015.  (Docket Entry No. 1.)  In the Complaint, Intervet claims to "bring this action to establish that its termination of the License Agreement was effective and proper, that it is not liable to Mileutis for any material breach of contract, and that, pursuant to the terms of the License Agreement, it is not subject to any continuing damages, any damages due to alleged negligence, or 'any consequential or special

damages, any damages for alleged loss of good will, profits, anticipated sales, or the like.'" (*Id.*) Mileutis claims that Plaintiff breached the License Agreement "and acted in bad faith by, among other things, performing substandard development work." (Docket Entry No. 140.)

On June 10, 2015, Defendant filed an Answer, Separate Defenses, Counterclaim and Demand for Jury Trial ("Answer"). (Docket Entry No. 8.) In the Answer, Mileutis claims that Intervet breached the License Agreement and acted in bad faith. (*Id.*) Specifically, Mileutis claims that

> part of the development plan required Intervet to conduct safety and efficacy field trials for the prevention and cure indications in the United States. Per the development plan, Intervet was required to collaborate with Mileutis to develop protocols and assemble the final reports for these pivotal clinical trials. However, Intervet failed to collaborate with Mileutis, failed to communicate with Mileutis, represented to Mileutis that it would have employees experienced with biologics assigned to the project but assigned employees to the study who had no experience with biologics, formulated more than 100 versions of CNH without input from Mileutis, neglected to follow even standard required manufacturing processes, and ultimately, ran a poorly designed and wholly flawed study in California (the "California study"), misreported the results, and then terminated the relationship with Mileutis based on the flawed California study.

> [Docket Entry No. 146.]

To support their claims, Mileutis retained Dr. Constantinides, an experienced expert witness, to address "Intervet's bad faith actions and inactions, breach of contractual obligations, and its failed efforts at manufacturing, formulation and process development." (*Id.*) Dr. Constantinides was deposed on June 29, 2021. (*Id.*) At the time of the deposition, Dr. Constantinides had allegedly spent between 100 and 200 hours working on this case. (Docket Entry No. 140.)

On July 15, 2021, the court reporter informed Dr. Constantinides that his deposition

transcript was available.  (Docket Entry No. 140.)  The court reporter instructed Dr. Constantinides to complete any errata and submit them to the court reporter and to Intervet within thirty-days. (Docket Entry No. 140.)  Mileutis alleges that Intervet's counsel, Mr. Charles Cohen, Esq. and Mileutis's counsel, Ms. Jenna Gabay, Esq., agreed to an extension that allowed Dr. Constantinides additional time to review his deposition transcript and prepare his errata sheet, through September 3, 2021.  (Docket Entry No. 146.)  Plaintiff's counsel does not recall this oral agreement.  (Docket Entry No. 147.)

On August 2, 2021, the parties met with the Court for a Telephone Conference.  (Text Minute Entry dated 8/2/2021.)  The parties were instructed to select a mediator and continue expert depositions.  (Text Minute Entry dated 8/2/2021.)  On August 19, 2021, this Court entered an Order of Designation for Mediation and administratively terminated the case.  (Docket Entry No. 127.)  All proceedings in this matter, except for discovery as agreed to by the mediator and counsel, were stayed until October 29, 2021.  (Docket Entry No. 127.)  Due to the identification of a conflict of interest of one of the parties with the selected mediator, Docket Entry No. 127 was rescinded. (Docket Entry No. 129.)  On August 23, 2021, the Court entered another Order of Designation for Mediation.  (Docket Entry No. 130.)  Pursuant to the Order, all proceedings in this matter, except for discovery as agreed to by the mediator and counsel was stayed until November 5, 2021. (Docket Entry No. 130.)

On August 23, 2021, Dr. Constantinides signed and dated an errata sheet (the "Errata Sheet").  (Docket Entry No. 140 and 146.)  The Errata Sheet was not exchanged with Plaintiff when it was obtained from Dr. Constantinides.  (*Id.*)  On October 27, 2021, the parties wrote to the Court and advised that the mediation was unsuccessful.  After reviewing this correspondence, the parties were directed to confer and submit a joint proposed revised schedule to the Court by

3

November 12, 2021.  (Docket Entry No. 132.)  On November 16, 2021, the Court entered a Text Order instructing the parties to complete all expert depositions by March 31, 2022.  (Docket Entry No. 133.)

On March 7, 2022, Mileutis served Dr. Constantinides' Errata Sheet to Intervet.  (Docket Entry No. 140.)  The Errata Sheet was served in conjunction with several other errata sheets and deposition transcripts after Mileutis finalized charts for confidentiality designations for the redacted transcripts and designations.  (Docket Entry No. 146.)

On July 20, 2022, Plaintiff moved to strike Dr. Constantinides' Errata Sheet.  (Docket Entry No. 139.)  Defendant filed an opposition on August 23, 2022 (Docket Entry No. 146), and Plaintiff replied on August 30, 2022.  (Docket Entry No. 147.)  The Court held oral argument on December 15, 2022.  (Docket Entry No. 153.)  During oral argument, Mileutis presented legal arguments that raised novel, yet seemingly important issues from what the initial briefings had presented.  Accordingly, the parties submitted supplemental briefs for the Court's consideration.  (*See* Docket Entry Nos. 158, 161, 170, and 171.)

## II.   LEGAL STANDARD

Rule 30(e) governs changes to a deposition transcript, and provides:

(e) Review by the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.  The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

"There are two components to this rule, which govern both the procedure and substance of this process of correcting depositions through errata." *Bartos v. Pennsylvania*, No. CIV 1:08-CV-0366, 2010 WL 1657284, at *4 (M.D. Pa. Apr. 23, 2010).  As a procedural matter, the rule permits a deponent only "30 days after being notified by the officer that the transcript or recording is available in which:  (A) to review the transcript or recording; and (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them."  F. R. Civ. P. Rule 30(e).  "Strictly adhering to these procedural time limits, court have frequently rebuffed belated efforts by deponents to change their deposition testimony, particularly when those changes are both tardy and clearly substantive."  *Id.* at *5 (citations omitted).

Alternatively, the substantive standards govern the type of corrections permitted through errata sheets.  *Id.*

Courts have diverged over whether the rule permits a deponent to change the substantive content of his or her testimony or whether it contemplates only ministerial changes to the transcript.  Despite this split of authority, district courts within the Third Circuit—like the majority of tribunals to have addressed Rule 30(e)-generally permit deponents to amend the content of their testimony.

[*In re Chocolate Confectionary Antitrust Litigation*, No. 08–MDL–1935, 2009 WL 2045160, at *2 (M.D. Pa. July 9, 2009) (citations omitted).]

Even those courts that generally permit deponents to amend the content of their testimony utilize a formulation to distinguish "explanatory" errata, which are generally permitted, and "contradictory" errata, which are not generally permitted.  *Bartos*, 2010 WL 1657284, at *6.

Thus, it has been said that "the purpose of an errata sheet is to *correct alleged inaccuracies* in what the deponent *said* at his

deposition, not to modify what the deponent said for tactical reasons or to reflect what he wishes that he had said.  Similarly, in construing Rule 30(e) courts have been mindful that "[t]he Rule cannot be interpreted to allow one to alter what was said under oath.  If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses.  Depositions differ from interrogatories in that regard.  A deposition is not a take home examination."

[*Id.* (emphasis in original) (internal citations omitted).]

To identify the purpose of the proposed errata to a deposition, the Third Circuit uses the same test that applies when defining a "sham affidavit."  *See EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 270 (3d Cir. 2010).  Courts are to review the errata sheet at issue and undergo a fact-sensitive inquiry to determine "if sufficiently persuasive reasons are given, if the proposed amendments truly reflect the deponent's original testimony, or if other circumstances satisfy the court that amendment should be permitted."  *Id.*

### III.   ANALYSIS

In deciding whether to permit changes made to a transcript, the Court must first address whether the proposed changes have met the procedural requirements set forth in Rule 30(e).  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 265-6 (3d Cir. 2010).  Next, the Court must "determine the effect of the errata sheet on the deposition transcript."  *Id.* at 267.

### A.   Procedural Deficiencies

"The procedural requirements of Rule 30(e) are clear and mandatory."  *EBC*, *Inc.*, 618 F.3d at 265.  Where a party or deponent has requested review of a transcript, he may "submit changes to [the] deposition within thirty days after being notified by the officer that the transcript is available for review."  *Id.* (quoting *Rios v. Bigler*, 67 F.3d 1543, 1552 (10th Cir. 1995) (alteration in original)).  It has been "emphasize[d] that Rule 30(e)'s thirty-day clock begins to run when the party is notified by the court reporter that transcript is available for review, *not* when the party or

deponent physically receives the transcript from the court reporter." *Id.* at 266 (emphasis in original) (citing *Hambleton Bros.*, 397 F.3d at 1224). "Although courts are split over whether to allow substantive changes to a deposition, there is no debate that the procedural requirements of Rule 30(e) must be adhered to." *Agrizap, Inc. v. Woodstream Corp.*, 232 F.R.D. 491, 493 (E.D. Pa. 2006) (internal footnote omitted)). Numerous courts have rejected changes to depositions when the procedural requirements of Rule 30(e) were not complied with. *Winston v. Marriott International, Inc.*, CIV. 03 CV 6321, 2006 WL 1229111, at *6 (E.D.N.Y. May 8, 2006) (excluding disputed errata sheet as utimely); *see also Freedman v. Fisher*, CIV. 13-3145, 2014 WL 5461488, at *5 (E.D. Pa. Oct. 28, 2014) (granting a motion to strike an expert's errata sheets on the basis that they "are untimely and would likely lead to a change in her testimony that might lead to testimony that would be grossly unfair to [the] [p]laintiffs").

Plaintiff argues that Dr. Constantinides' changes to his deposition violate the procedural aspects of Federal Rule of Civil Procedure 30(e) and should be suppressed. The Court agrees that Defendant has failed to meet the procedural requirements of Rule 30(e). Here, the deposition of Dr. Constantinides was taken on June 29, 2021. (Docket Entry No. 140.) On July 15, 2021, the court reporter emailed a copy of the transcript to Defendant's counsel, along with a letter informing Defendant that the Errata Sheet and acknowledgement page should be returned within thirty days to both the court reporter and Plaintiff's counsel. (Docket Entry No. 140.) The Court understands Defendant's position that the parties had allegedly agreed that Dr. Constantinides could have an extension to review his deposition sheet and prepare the Errata Sheet through September 3, 2021. (Docket Entry No. 146.) Dr. Constantinides then completed his review and the Errata Sheet prior to the September 3, 2021, deadline, notarizing the Errata Sheet on August 23, 2021, which was the same date that the Court administratively terminated the case to refer the parties to mediation.

(Docket Entry No. 130.)

Defendant argues that its late exchange of the Errata Sheet should be excused because it was eventually transmitted to Plaintiff after the matter was reinstated.  (Docket Entry No. 146.)  The stay of proceedings, however, was only in effect until November 5, 2021.  (Docket Entry No. 130.)  Even if Defendant's claim that an extension to submit the Errata Sheet by September 3, 2021, was agreed upon by the parties is true, Defendant did not submit a copy of the Errata sheet until March 7, 2022.  (Docket Entry No. 140.)  Defendant has provided no justification as to why it waited an additional four months, until March 2022, to serve the Errata Sheet on Plaintiff.  On this basis alone, the Court finds there are justifiable grounds to exclude the admission of the Errata Sheet due to untimeliness.  *See, e.g.*, *Bartos*, 2010 WL 1657284, at \*17 (citing various cases where proposed errata were denied due to untimeliness).  Even though the Errata Sheet can be dismissed on procedural grounds, the Court will still address the corrective and substantive changes made in the Errata Sheet.

**B.**   **Substantive Changes**

The standards governing substantive changes to errata has been articulated in *EBC, Inc. v Clark Building Systems, Inc.*, 618 F.3d 253 (3d Cir. 2010).  In *EBC, Inc.*, the Third Circuit has instructed district courts to apply a "flexible approach" in determining when to permit or exclude a contradictory errata sheet.  *Id.* at 267.  The Third Circuit cautioned that, in the summary judgment context, "a party may not generate from whole cloth a genuine issue of material fact (or eliminate the same) simply by re-tailoring sworn deposition testimony to his or her satisfaction."  *Id.* at 267-68 (citing *Hambleton Bros. Lumber Co. v. Balkin Enters.*, 397 F.3d 1217, 1225) ("While the language of [Rule] 30(e) permits corrections 'in form or substance,' this permission does not properly include changes offered solely to create a material factual dispute in a tactical attempt to

evade an unfavorable summary judgment.")  To require the district court "in all cases to permit contradictory alterations could risk the defeat of summary judgment in a large swath of cases for which a Rule 56 disposition otherwise would be appropriate.  Preservation of the original testimony for impeachment at trial serves as cold comfort to the party that should have prevailed at summary judgment."  *Id.*

Notably, other courts within this Circuit have cautioned against permitting contradictory Errata Sheets at the summary judgment stage.  *See Alcon Research Ltd. v. Barr Labs. Inc.*, CIV No. 09-CV-0318, 2011 WL 13135574, at *7-8 (D. Del. Oct. 25, 2011) (noting that "[i]f deponents could freely contradict their deposition testimony at the summary judgment stage, unscrupulous parties may attempt to manufacture sham factual disputes through their contradictory testimony to defeat otherwise proper summary judgment motions."); *see also ConsulNet Computing, Inc. v. Moore*, 631 F. Supp. 2d 614, 625-26 (E.D. Pa. 2008) (explaining that "Rule 30(e) challenges only face a heightened standard of review if they have the potential to affect summary judgment.").

Applying the flexible case-by-case approach, the Third Circuit has directed that a district court may refuse "to consider proposed substantive changes that materially contradict prior deposition testimony, if the party proffering the changes fails to provide sufficient justification." *EBC, Inc.*, 618 F.3d at 268.  At the same time, the court may, in its discretion, choose to allow contradictory changes as the circumstances may warrant.  That is, "nothing requires courts to strike contradictory errata if sufficiently persuasive reasons are given, if the proposed amendments truly reflect the deponent's original testimony, or if other circumstances satisfy the court that amendment should be permitted." *Id.* at 270.  Each case will present fact-sensitive circumstances and there is no one-size-fits-all rule.

From the outset, the Court notes that the parties have devoted considerable attention in their supplemental briefs regarding whether this Court must engage in an additional analysis when considering to strike the errata of an expert witness.  Defendant argues that, where the errata of an expert witness is involved, the Court must also consider the factors set forth in *Meyers v. Pennypack Woods Home Ownership Association*, 559 F.2d 894 (3d Cir. 1977).[1]  (Docket Entry Nos. 157 and 171.)  Plaintiff responds that Defendant's position is misguided and that the *Pennypack* factors are not to be invoked when considering a motion to strike errata.  (*See* Docket Entry Nos. 161 and 170.)

The Court finds that *Pennypack* addressed similar, yet distinct issues.  *Pennypack* enumerated certain factors to be considered when deciding whether to exclude the testimony of a late-disclosed witness.  Since then, courts have utilized *Pennypack* to address other kinds of untimely disclosures, including the production of late expert reports or expert testimony that advances untimely legal theories and opinions.  *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012) (excluding expert evidence as discovery sanction); *Love v. Rancocas Hosp.*, CIV. 01-5456, 2005 WL 6011252 at *1 (D.N.J. Mar. 31, 2005) (involving a motion to bar an expert report produced by the plaintiff); *Abbott Laboratories v. Lupin Ltd.*, CIV Nos. 10-1578, 10-2073, 10-2139, 10-2352, 2012 WL 1994477 (D.N.J. June 4, 2012)(addressing *Pennypack* for an application to strike the plaintiff's expert report as untimely and in violation of the scheduling order); *Otsuka Pharm. Co. v. Aurobindo Pharma Ltd.*, 2017 U.S. Dist. LEXIS 225464, *14 (noting that "[t]he *Pennypack* analysis is most applicable to the enforcement of a final pretrial order, such

---

[1]  The *Pennypack* factors are: (1) The prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation.  *Pennypack*, 559 F.2d at 905.

as where a party seeks to preclude testimony at trial of a witness not identified in the final pretrial order").

Defendant relies on an unpublished decision from the United States District Court of Delaware, *Acceleration Bay LLC v. Activision Blizzard, Incorporated*, 2017 WL 11517421, at *15–17 (D. Del. Nov. 7, 2017), where a Delaware Special Master applied *Pennypack* to a motion to strike errata. A review of *Acceleration Bay* reveals that the Special Master did not refer to any Third Circuit precedent to support his decision to apply *Pennypack* to a motion to strike errata. *Id.* Without more, the Court finds that *Acceleration Bay* is not controlling. Indeed, the other cases relied upon by Defendant appear to apply the *Pennypack* factors to the circumstances in which the Third Circuit intended them—namely, motions to exclude the submission of untimely disclosed evidence or testimony.[2]

Here, the Third Circuit appeared to leave no doubt when thirty years later it decided *EBC, Inc. v. Clark Building Systems, Inc.*, where it had been stated that:

> This Court has not spoken previously regarding: (1) the extent to which a party may establish a genuine issue of material fact by using a deposition errata sheet; and (2) whether and when a District Court may ignore a noncompliant errata sheet. *Accordingly, we first take the opportunity to address the contours of the rule governing errata sheets*. We then apply the standards we enunciate.

---

[2] Defendant's opposition brief cites to *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133 (3d Cir. 2000), for support that the Third Circuit applied the *Pennypack* factors on motions to exclude expert testimony. The *Nicholas* decision applied the *Pennypack* factors to an untimely disclosed fact. Further, Defendant's supplemental briefs has referred to a handful of other cases within the Third Circuit, none of which apply *Pennypack* to a motion to strike errata. *See ConsulNet Computing, Incorporated v. Moore*, 631 F.Supp.2d 614 (E.D. Pa. 2008) (applying *Pennypack* to the late submission of an expert report, but in relevant part, considering whether an errata sheet complied with Rule 30(e) and "materially alter[ed]" the deposition testimony in question); *see also Federal Trade Comm'n v. Innovative Designs, Inc*., 489 F.Supp.3d 378, n. 31 (W.D. Pa. 2020) (applying *Pennypack* where a party failed to consider discovery deadlines in filing a motion for leave to file a rebuttal expert report).

[618 F.3d at 264 (emphasis added).]

The Court will therefore limit its analysis to the standards established in *EBC, Inc.*, *supra*, assessing whether the "proposed substantive changes . . . materially contradict prior deposition testimony" and if "the party proposing the changes fails to provide sufficient justification" for those changes. *Id.* at 268. Other factors to be considered include: (1) whether the proffered justification for a change is sufficient, (2) whether the earlier testimony reflects confusion that the errata attempts to explain, (3) whether the errata is truly reflective of the initial testimony, (4) whether deponent's counsel had an opportunity to object or cross-examine the witness, and (5) whether other fact sensitive circumstances justify the amendment. *Id.* at 270.

### 1.    <u>Unchallenged Changes</u>

Dr. Constantinides' Errata Sheet consists of both corrective and substantive changes. Of those, there appears to be approximately eighty-eight changes that list transcription errors, spelling errors, errors to "conform the facts" the record, and other errors to "clarify the record." (*See* Docket Entry No. 141, Ex. D.) These corrective changes appear to be unchallenged by Plaintiff. In the absence of a specific challenge or objection, the Court will grant these Errata entries despite the above-mentioned procedural deficiencies.

### 2.    <u>Challenged Changes</u>

In addition to the corrective changes, Dr. Constantinides has proposed a number of substantive amendments through his Errata Sheet. Akin to the approach set forth in Magistrate Judge King's recent decision in *Patroni v. Harrah's Atl. City Operating Co., LLC*, CIV. 18-15637, 2022 WL 2375721, at *8 (D.N.J. June 30, 2022), the Court will categorize the changes made in a series of related "topics" to streamline the analysis.

**<u>Testimony Related to Contamination</u>**

First, Plaintiff argues that changes made in the Errata Sheet related to the contamination of the California Study materially contradict prior deposition testimony.  (Docket Entry No. 140.)  Plaintiff asserts that an important part of this case is to explain why Mileutis' product, casein hydrolysate ("CNH"), was not effective when Plaintiff had tested it in a study in California (the "California Study").  (Docket Entry No. 140, at 8.)  In explaining why the California Study may not have been successful, Defendant argues that the CNH used by Plaintiff was contaminated.  (*Id.*)  To support Defendant's position, Dr. Constantinides has provided an expert report asserting that one or more of the batches of CNH used in the California Study was contaminated and that it is "[i]t is important to know the source of contamination in the [CNH] batch and how it could have been prevented."  (Docket Entry No. 141, Ex. A, at ¶ 47.)

At page ten of the deposition, Dr. Constatinides appears to have stated that he would be providing an opinion that one or more batches of CNH used in the California study were contaminated.

> [Page Ten]
>
> 12 Q. Okay. Dr. Constantinides, are
> 13 you offering an expert opinion in this case
> 14 that one or more of the batches of casein
> 15 hydrolysate used in the California study was
> 16 contaminated?
> 17 A. Yes.
>
> [*See* Docket Entry No. 141, Ex. B, at 10:1-17.]

Dr. Constantinides stated the basis of this opinion was that "some vials [of CNH] were found to be opened."  (*Id.* at 166:6-7.)

Yet, as the deposition continued, Dr. Constantinides appears to have admitted that he did not know if any of the vials that he believes were found to be open were used in the California

13

Study.  Pages eleven, twelve, thirteen, and fourteen of Dr. Constantinides' deposition illustrate the

relevant exchanges concerning contamination of the California Study between Plaintiff's counsel

and Dr. Constantinides during the deposition:

> [Page Eleven:]
>
> 22 Q. And do you know if any of the
> 23 vials that were found to be opened were
> 24 actually used in the California study?
> 25 A. I don't know.
>
> [Page Twelve:]
>
> 1 Q. So it's entirely possible that
> 2 the open -- that none of the vials that were
> 3 opened were actually used in the California
> 4 study, correct?
> 5 MS. DEL PIZZO: Objection.
> 6 A. I don't know.
>
> . . .
>
> 18 And the answer to -- the answer
> 19 to the last question as to whether it was the
> 20 primary batch -- I'm sorry.
> 21 The answer to the last question
> 22 as to -- my question was: It's entirely
> 23 possible that none of the vials that were
> 24 actually found to be opened were used in the
> 25 California study, correct?
>
> [Page Thirteen:]
>
> 1 MS. DEL PIZZO: Objection.
> 2 A. I don't know that. It's
> 3 possible, but I don't know.
> 4 QUESTIONS BY MR. FITZPATRICK:
> 5 Q. Okay. So you don't actually
> 6 know whether any of the vials used in the
> 7 California study were contaminated, right?
> 8 MS. DEL PIZZO: Objection.
> 9 A. That's correct. I don't know.
> 10 QUESTIONS BY MR. FITZPATRICK:
> 11 Q. Okay. You wouldn't -- you

12 wouldn't offer an opinion to a reasonable
13 degree of scientific certainty that any vial
14 used in the California study, any vial of
15 casein hydrolysate, was actually
16 contaminated, correct?
17 MS. DEL PIZZO: Objection.
18 A. I recall, again, seeing that
19 some were open -- some vials were found to be
20 opened, but no specifics about, again, which
21 batch and how many vials were found to be
22 open.
23 QUESTIONS BY MR. FITZPATRICK:
24 Q. Okay. So your recollection is
25 that there were some vials found to be open,

[Page Fourteen:]

1 correct?
2 A. Correct.
3 Q. Do you know if those vials ever
4 even made it to California, the open vials?
5 A. I don't.
6 Q. Okay.
7 A. I don't.
8 Q. So you -- so in fairness, you
9 don't have any idea whether any vial of
10 casein hydrolysate used in the California
11 study was actually contaminated, correct?
12 A. Correct.

[*See* Docket Entry No. 141, Ex. B, at 16-19.]

Through the Errata Sheet, Dr. Constantinides has proposed the following changes to his

testimony:

| Transcript Citation | Original | Updated | Reason |
|---|---|---|---|
| p. 11, line 25 | I don't know | As I testified on page 10, lines 12-17, and p. 166, lines 6-18, I am offering an expert opinion in this case that one or more of the batches of casein hydrolysate used in the California study was | I believe I did not accurately hear counsel's question when he appeared to ask a different question – but from the transcript, it looks like the same question a second time. |

| | | | contaminated. |
|---|---|---|---|
| p.13, lines 2-3 | I don't know.  It's possible, but I don't know. | As I testified on page 10, lines 12-17, and p. 166, lines 6-18, I am offering an expert opinion in this case that one or more of the batches of casein hydrolysate used in the California study was contaminated. | I believe I did not accurately hear counsel's question when he appeared to ask a different question – but from the transcript, it looks like the same question a third time. |
| p.14, lines 2-17 | "I don't. ..I don't…Correct…Yes [sic] | As I testified on page 10, lines 12-17, and p. 166, lines 6-18, I am offering an expert opinion in this case that one or more of the batches of casein hydrolysate used in the California study was contaminated. | I believe I did not accurately understand what counsel was asking, and thought he was saying he didn't know to a question regarding specifically which vial he could recall was contaminated. But, as reflected in the documents, including but not limited to, those marked MAH 00041214 and MAH00046663, I am offering an expert opinion in this case that one or more of the batches of casein hydrolysate used in the California study was contaminated. |

(Docket Entry No. 141, Ex. D.)

        In support of the Errata Sheet, Defendant argues that the proposed changes are "clarifications consistent with [Dr. Constantinides'] original testimony and not an attempt to re-write testimony." (Docket Entry No. 146.)  The Court disagrees.  The proposed Errata Sheet add material changes to the testimony to provide that Dr. Constantinides will be "offering an expert opinion in this case that *one or more of the batches of casein hydrolysate used in the California study was contaminated*." (Emphasis added.)  Dr. Constantinides has contradicted his unequivocal

answers to the questions in his initial testimony.[3]  Dr. Constantinides claims that he was unable to understand questioning or experienced confusion is in conflict with the transcript.   If Dr. Constantinides did not understand or comprehend the questions asked, he had ample opportunity to request clarification from Plaintiff's counsel on the record.   Other portions of the transcript reflects Dr. Constantinides willingness to request additional information when confused and reflects the parties' numerous breaks, as well as the presence of counsel.   Accordingly, the above-identified substantive amendments shall be stricken.

**<u>Testimony Related to Breaches of Contract</u>**

Second, Plaintiff contends that Dr. Constantinides' amendments to the Errata Sheet concerning Defendant's breach of contract claims materially contradict his prior testimony. (Docket Entry No. 140, at 14.)  For background—through his expert report—Dr. Constantinides opines that "[Plaintiff] acted in bad faith and in breach of its contractual obligations by failing to proactively communicate, collaborate and solicit input and hands-on assistance from Mileutis on raw materials, CNH formulation and process development."  (Docket Entry No. 141, Ex. A, at ¶ 61.)  Dr. Constantinides has been retained as an expert witness to discuss Intervet's bad faith actions and inactions, breach of contractual obligations, and failed manufacturing efforts.  (Docket Entry No. 146, at *1-2.)

Though Dr. Constantinides had initially stated that he was "opining that [Plaintiff] breached this license agreement," he later took the position that he would not be offering an

---

[3]  As raised by Plaintiff, the transcript reflects that when asked "[d]o you know if those vials ever even made it to California, the open vials," Dr. Constantinides answered "I don't" twice.  On his opinion about contamination, when asked "[s]o you—so in fairness, you don't have any idea whether any vial of [CNH] used in the California study was actually contaminated, correct," Dr. Constantinides candidly responded "correct" twice.  (*See* Docket No. 147, at 10.)

opinion as to the exact "terms of the agreement" that had been breached, as doing so was "beyond

the scope of [his] report" and "beyond [his] expertise":

> 7 Are you opining that Merck
> 8 breached this license agreement?
> 9 A. Yes.
> 10 Q. Okay. Now, am I correct, in
> 11 your report, you don't actually point to any
> 12 terms of this agreement that you're claiming
> 13 were breached, correct?
> 14 MS. DEL PIZZO: Objection.
> 15 A. That's correct. That was
> 16 beyond the scope of my report.
> 17 QUESTIONS BY MR. FITZPATRICK:
> 18 Q. Okay. So you're not opining
> 19 about any specific terms of this agreement
> 20 that, in your opinion, were breached,
> 21 correct?
> 22 MS. DEL PIZZO: Objection.
> 23 A. Correct.

[Docket Entry No. 141, at 27:7-23.]

When Plaintiff's counsel inquired as to whether Dr. Constantinides would offer an expert

opinion regarding the precise terms of the agreement that may have been breached, he received

the following response:

> 25 Q. So, for example, you're not
> 1 intending to tell the jury, like, I -- you
> 2 know, "If you go to Article 2.5, you know,
> 3 Merck breached the terms of this agreement"?
> 4 Things like that are not part of your
> 5 opinion, correct?
> 6 MS. DEL PIZZO: Objection.
> 7 A. That's correct.

[*Id.* at 27:25 to -28:7.]

18

The Errata Sheet concerns pages thirty-one and thirty-six of Dr. Constantinides' deposition, which illustrates the following exchanges concerning the breach of contract claim between Plaintiff's counsel and Dr. Constantinides:

[Page Thirty-One:]

6 Q. Okay. But I think we just
7 established you're not -- you're not offering
8 the opinion that Merck breached any of the
9 terms of the license agreement, correct?
10 MS. DEL PIZZO: Objection.
11 A. Correct.
12 QUESTIONS BY MR. FITZPATRICK:
13 Q. Are you offering the opinion
14 that Merck breached any of the terms of the
15 BIRD Agreement?
16 MS. DEL PIZZO: Objection.
17 A. Again, I'm -- sorry.
18 QUESTIONS BY MR. FITZPATRICK:
19 Q. That's okay.
20 A. I'm not an attorney, so I
21 cannot offer any legal opinion on this.
22 Q. That's perfectly fair. I just
23 want to be clear.
24 For purposes of your opinion,
25 you will not -- it's not your intention to

[Page Thirty-Two:]

1 tell the Court or the jury that Merck
2 breached any of the terms of this BIRD
3 Agreement, correct?
4 MS. DEL PIZZO: Objection.
5 A. That's correct.

[Docket Entry No. 141, Ex. B, at 31:6 to -32:5.]

In the Errata Sheet, Dr. Constantinides submitted the following changes to his testimony:

| Transcript Citation | Original | Updated | Reason |
|---|---|---|---|
| p. 31, line 11 | "Correct" | "not correct"  As I testified on page 27, line 9, I am offering an | I believe I did not accurately hear counsel's question when he appeared to ask a different |

19

| | | expert opinion in this case that Merck breached this license agreement. | question – but from the transcript, it looks like the same question again. I testified that I cannot offer a legal opinion but I am offering an expert opinion that Merck breached this license agreement. |
|---|---|---|---|
| p.32, line 5 | "that's correct" | "that's not correct"<br><br>As I testified on page 31, lines 2-5, I am offering an expert opinion in this case that Merck breached the BIRD agreement. | I believe I did not accurately hear counsel's question when he appeared to ask a different question – but from the transcript, it looks like the same question again. I testified that I cannot offer a legal opinion but I am offering an expert opinion that Merck breached the BIRD agreement. |

(Docket Entry No. 141.)

Defendant argues that, in his capacity as an expert, Dr. Constantinides would only be offering an expert opinion, "having reviewed many contracts over his decades of experience," that Plaintiff breached its contractual obligations. (Docket Entry No. 171, at 3.) Defendant asserts that Dr. Constantinides misunderstood the questions to be asking whether he would be offering a "legal opinion" on the alleged breaches of contract. The Errata Sheet reiterates that Dr. Constantinides "believe[s]" that he did "not accurately hear counsel's question," and that he testified he "cannot offer a legal opinion."

The Court finds the initial questions and testimony to be unambiguous. Dr. Constantinides confirmed on multiple occasions that he would not be opining that Plaintiff breached the terms of either contract. The proposed changes materially contradict the initial testimony to reflect an opposite position: directly changing his responses from "that's correct" to "that's not correct." Nor is there sufficient justification for the proposed changes. The Court does not find that the

questions being asked were not phrased in such a way that could have led to a misinterpretation that Plaintiff was only asking for Dr. Constantinides' legal opinion.  In the event there was such a misunderstanding, defense counsel could have clarified the issues with the witness and opposing counsel.   Indeed, there are numerous objections on the transcript—none of which sought clarifications to these questions being asked.  Defendant's attempt to now re-write the testimony, after the fact, to reflect a more favorable transcript, is not permissible.[4]   The above proposed amendments shall be stricken.

**Testimony Related to Project Managers**

Third, Plaintiff argues that changes made in the Errata Sheet related to Plaintiff's project managers materially contradict prior deposition testimony.  (Docket Entry No. 140.)  In his expert report, Dr. Constantinides opines that the project managers assigned by Plaintiff lacked the experience or qualifications for their position, which "hindered timely communication and resolution of the arising issues, especially because multiple sites worked on the project."  (Docket Entry No. 141, Ex. A, at 6 ¶ 34.)

Pages fifty-one, fifty-two, and fifty-three of Dr. Constantinides' deposition illustrate the following exchanges concerning the qualification of the project managers between Plaintiff's counsel and Dr. Constantinides during the deposition:

> [Page Fifty-One:]
>
> 13 Q. Are you offering an opinion
> 14 that Dr. Meadows didn't have enough
> 15 experience to be a project manager for this
> 16 case?
> 17 MS. DEL PIZZO: Objection.

---

[4]  The Court is also mindful that the Errata Sheet is being produced prior to the filing of summary judgment motions.   As set forth in *EBC Inc.*, the Court must prevent parties from freely contradicting their deposition testimony at the summary judgment stage, guarding against any attempts to manufacture factual disputes through contradictory testimony to defeat summary judgment motions.

18 A. That's not what I'm saying.
19 QUESTIONS BY MR. FITZPATRICK:
20 Q. No, I'm asking. And that's
21 fine.
22 A. No, no. He can certainly serve
23 as a project manager. I said that. In order
24 for the project to move forward, whatever
25 you're a project leader, project

[Page Fifty-Two:]

1 management -- manager or project director,
2 you have to have experience in biologics
3 development, especially in light of the fact
4 that CNH is a very complex biologic mixture
5 of polypeptides, oligopeptides, and small
6 peptides. So this is an absolute
7 requirement, in my view, based on my
8 experience in biologics, that the leader or
9 the manager should have in order to fully
10 assess the results but also make
11 recommendations in terms to -- you know, on
12 the next steps.
13 Q. So is it your intention to tell
14 the Court or the jury in this case that
15 Cheyney Meadows did not have sufficient
16 experience to serve as project manager in
17 this case?
18 MS. DEL PIZZO: Objection.
19 That's not what he said.
20 A. No. That's not what I said.
21 QUESTIONS BY MR. FITZPATRICK:
22 Q. Great.
23 Was Fons Rutten one of the
24 project managers in this case?
25 A. Yes.

[Page Fifty-Three:]

1 Q. Do you intend to tell the Court
2 or the jury that Fons Rutten didn't have
3 sufficient qualifications or experience to
4 serve as project manager in this case?
5 A. No, again --
6 Q. Was Allan -- I'm sorry. I
7 didn't mean -- no, go ahead, please, I didn't

22

8 mean to cut you off.
9 A. Yes. No. The answer is no.
10 Please go ahead with your next
11 one.
12 Q. Okay. Was Allan Weingarten one
13 of the project managers in this case?
14 A. Yes.
15 Q. Do you intend to tell the Court
16 or the jury that Allan Weingarten didn't have
17 sufficient qualifications or experience to
18 serve as project manager?
19 A. No.

Dr. Constantinides submits the following changes to his testimony:

| Transcript Citation | Original | Updated | Reason |
|---|---|---|---|
| p. 52, line 20 | "that's not what I said" | do intend to offer an opinion that Cheyney Meadows was not qualified to be a project manager on this project because he had no experience in biologics. As I testified on p. 52, line 6, "that is an absolute requirement" as well as on p. 81, lines 3-5: "it was essential for the project leader to have experience with biologics." | I believe I did not respond to counsel's question as reflected in the transcript, and was responding to the question of whether Cheyney Meadows was qualified to be "project manager" generally, not a project manager for a project dealing with a biologic. |
| p. 53, lines 5, 9, 19 | "no, again--…yes. No. that answer is no…no" | I do intend to offer an opinion that Fons Rutten and Allan Weingarten were not qualified to be project managers on this project because they had no experience in biologics. As I testified on p. 52, line 6, "that is an absolute requirement" as well as on p. 81, lines 3-5: "it was essential for the project leader to have experience with biologics." | I believe I did not respond to counsel's question as reflected in the transcript, and was responding to the question of whether Fons Rutten and Allan Weingarten were qualified to be "project managers" generally, not a project manager for a project dealing with a biologic. |

(Docket Entry No. 141.)

Defendant concedes that "[w]hen asked whether three specific individuals, Cheyney Meadows, Fons Rutten and Allan Weingarten, about their qualification to be project managers generally, Dr. Constantinides testified that they all had experience to be project managers." (*Id.* at 12–13.) Defendant argues, however, that Dr. Constantinides "later clarified his testimony that in order to be a project manager *for this particular project*, it was imperative and an absolute requirement to have experience in biologics, which these individuals did not have." (*Id.* at 13 (emphasis in original)). In preparing the Errata Sheet, Defendant asserts that Dr. Constantinides felt compelled to clarify his responses, which, in the context of his other testimony, are not contradictory.

The relevant testimony and Plaintiff's counsel's questions asked if Dr. Constantinides believed whether these three project managers lacked the qualifications or experience to act as project managers "in this case". Dr. Constantinides has changed each "no" answer to "I do intend to offer an opinion that [the three project managers] were not qualified to be project managers on this project . . . ." These are substantive changes that materially contradict Dr. Constantinides' prior testimony.[5] For these reasons, the Court will again strike the proposed amendments in the Errata Sheet.

**Testimony Related to the Israeli Study**

Fourth, Plaintiff raises that, "[d]espite claiming in his expert report that the Israeli Study showed that CNH reduced the risk of new intramammary infections, Dr. Constantinides admitted

---

[5] Whether Dr. Constantinides believed the three project managers were qualified to handle the specific project at hand, which involved biologics, is a separate issue. Should there be any issues at trial, Dr. Constantinides can present the same justifications for his initial responses; namely, that he believed these three individuals were "generally qualified" to be project managers, but were not necessarily qualified or equipped to handle the specific project in question.

at his deposition three times that CNH did not meet the Israeli Study protocol's definition of success[.]"  (Docket Entry No. 140, at 17-18.)  Pages ninety-seven, ninety-eight, and one hundred of Dr. Constantinides' deposition illustrate the relevant exchanges:

> [Page Ninety-Seven:]
>
> 1 reference to protocol in this particular
> 2 paragraph.
> 3 QUESTIONS BY MR. FITZPATRICK:
> 4 Q. Agreed. We're on the same
> 5 page.
> 6 You didn't mention the
> 7 protocol, and you didn't mention the success
> 8 criteria, correct?
> 9 A. Yeah.
> 10 Q. Yeah. Okay.
> 11 I'm now, separate --
> 12 understood.
> 13 I'm asking separately. We're
> 14 now looking at the protocol and looking at
> 15 the data.
> 16 Am I correct that the product
> 17 failed to meet the efficacy criteria and the
> 18 protocol for prevention?
> 19 A. Yeah.
> 20 MS. DEL PIZZO: Objection.
> 21 A. There may be other data,
> 22 actually, subsequent data, obtained, which
> 23 supports what is in the protocol. Again, I'm
> 24 not --
> 25
>
> [Page Ninety-Eight:]
>
> 1 QUESTIONS BY MR. FITZPATRICK:
> 2 Q. Yeah. I'm talking about the
> 3 data you cited in paragraph 51.
> 4 I just want to know whether the
> 5 data you actually cited shows that the
> 6 product failed to meet the efficacy criteria
> 7 for prevention in the protocol that we just
> 8 looked at.
> 9 A. It appears --
> 10 MS. DEL PIZZO: Same objection.

11 QUESTIONS BY MR. FITZPATRICK:
12 Q. Sorry. Go ahead.
13 A. It appears, indeed, that, you
14 know, there is difference between the
15 targeted efficacy in the protocol versus what
16 was obtained here. That's all I can say.

. . .

[Page One Hundred:]

5 QUESTIONS BY MR. FITZPATRICK:
6 Q. So what you're just talking
7 about there -- and I don't want to get into
8 the details of this right now, but Mileutis
9 might try to make the product more effective
10 in the future. That's what you're talking
11 about in that sentence, right?
12 A. That's correct, yes.
13 Q. And that's fine.
14 My question is really just
15 that, based on the data you actually point to
16 and the protocol we actually looked at, the
17 product didn't meet the criteria to be
18 determined as effective as defined in the
19 protocol. I just want to know if that's
20 correct. Is that correct?
21 MS. DEL PIZZO: Objection.
22 A. Yes.
23 QUESTIONS BY MR. FITZPATRICK:
24 Q. Is the answer -- your counsel's
25 objection is preserved.

[Page One Hundred and One:]

1 Is the answer "yes"?
2 A. Yes, yes.
3 Q. Okay.

Dr. Constantinides submits the following changes to his testimony:

| Transcript Citation | Original | Updated | Reason |
| --- | --- | --- | --- |
| p. 97, line 19 | "yeah" | "no" | I testified that I did not review the protocol and was not opining on the clinical aspects of the |

26

| | | | |
|---|---|---|---|
| | | | California study and was not in the position to opine on whether the product met the criteria of MLT-18 (see p. 92- 96) and on p. 98, line 22: "obviously they demonstrate efficacy..[*sic*]" |
| P. [*sic*] 100, line 22 | "yes" | "no" | I testified that I did not review the protocol and was not opining on the clinical aspects of the California study and was not in the position to opine on whether the product met the criteria of MLT-18 (see p. 92-96) and on p. 98, line 22: "obviously they demonstrate efficacy.." |

(Docket Entry No. 141.)

Through the Errata Sheet, Dr. Constantinides now purports to change these answers from "yes" to "no." Simply put, the Court finds that these are "180-degree" changes in substance that directly contradict Dr. Constantinides' initial testimony. Accordingly, the Court will strike the above proposed changes.

**Testimony Related to Targeted Product Attributes**

Fifth, Plaintiff argues that changes made in the Errata Sheet related to the targeted product quality attributes materially contradict prior deposition testimony. (Docket Entry No. 140, at 18–19.) Pages one hundred and thirty-six and one hundred and thirty-seven of Dr. Constantinides' deposition illustrate the following relevant exchanges between Plaintiff's counsel and Dr. Constantinides during the deposition:

[Page One Hundred and Thirty-Six:]

19 Q. What are the targeted product

20 quality attributes, safety and efficacy, for
21 this product?
22 MS. DEL PIZZO: Objection.
23 A. Again, I'm not qualified to
24 address that particular question. If you ask
25 me about the product qualities in reference

[Page One Hundred and Thirty-Seven:]

1 to formulation, manufacturing, that's a
2 different question.
3 QUESTIONS BY MR. FITZPATRICK:
4 Q. Okay. So are you qualified to
5 opine that the product meets the targeted
6 product quality attributes, safety and
7 efficacy?
8 MS. DEL PIZZO: Objection.
9 A. I just responded by saying this
10 is outside the area of my expertise.

Dr. Constantinides submits the following changes to his testimony:

| Transcript Citation | Original | Updated | Reason |
| --- | --- | --- | --- |
| p. 137, lines 9-10 | …I just responded by saying this is outside the area of my expertise… | …yes as to the targeted product quality attributes (which incorporates safety and efficacy)… | I believe I did not accurately hear counsel's question and was responding to the question of what is the identity of the targeted product quality attributes, and thought he was asking about safety and efficacy separate from the product quality attributes, but safety and efficacy are part of the targeted product quality attributes. I intend to testify that the product meets the targeted product quality attributes (which incorporates safety and efficacy). |

(Docket Entry No. 141.)

28

The above testimony reflects that Dr. Constantinides indicated that he was "not qualified to address" the targeted product quality attributes, safety and efficacy for CNH.  When asked, "[s]o are you qualified to opine that the product meets the targeted product quality attributes, safety and efficacy?," Dr. Constantinides replied "I just responded by saying this is outside the area of my expertise."   Through the Errata Sheet, Dr. Constantinides changes his answer from "I just responded by saying this is outside the area of my expertise" to "yes as to the targeted product quality attributes" and that he "intend[s] to testify that the product meets the targeted product quality attributes."  The Court will strike this amendment as a substantive change that materially contradicts the initial testimony.

**<u>Other Substantive Changes</u>**

Finally, Plaintiff argues that there is no justification for a number of the purported testimony changes made in the Errata Sheet and further alleges that the changes are "nonsensical and belied by the transcript."  (Docket Entry No. 140.)  For instance, Plaintiff raises changes in Dr. Constantinides' testimony regarding Plaintiff's alleged failure to communicate and collaborate with Defendant.  Changes to this testimony were made on pages seventy-two and eighty-five of Dr. Constantinides' deposition transcript:

| Transcript Citation | Original | Updated | Reason |
|---|---|---|---|
| p. 72, line 16 | "yes, yes" | As I testified (p. 70, line 21, for instance), and as reflected in my report, I did testify to and do intend to tell the jury that Merck failed to tell Mileutis "actual facts" about the project throughout the course of the project. | I believe I did not accurately hear counsel's question when he appeared to ask a different question – but from the transcript, it looks like the same question again, which I had already answered repeatedly. |
| p. 85, line 20 | "correct" | "not correct" | I believe I did not accurately hear counsel's question and was |

| | | | responding to the question of whether Merck informed Mileutis it was attempting to solve the precipitation issue and not that Merck told Mileutis about the" lots of different formulations" it was trying, which Merck failed to do. And I do not recall seeing lots of different formulations in the materials I reviewed. |
|---|---|---|---|

(Docket Entry No. 141.)

Other substantive changes have been made to the testimony on pages one hundred and nine, one hundred and ten, one hundred and eleven, one hundred and twelve, one hundred and forty-one, and one hundred and sixty-four:

| Transcript Citation | Original | Updated | Reason |
|---|---|---|---|
| p. 109, lines 7-10 | "…they were more or less similar, these three batches" | Counsel reframed the response on lines 12-13 to: "assuming they were similar". As I testified they were "more or less similar" and I intend to testify to the jury that they were less similar (different) in light of the fact that some used in the California study were contaminated and the three batches resulted in different rates of precipitation. | I believe counsel's reframing of the answer is incorrect and therefore further clarifies his testimony. |
| p. 112, lines 20-21 | "yes. That is 'yes'. I give again." | Counsel reframed the response on p. 111, lines 17-21 to: "…it used two batches which generally the same composition…"". As I testified, p. 109, lines 7-10, they were "more or | I believe counsel's reframing of the answer is incorrect and that the ensuing counsel colloquy confused the question, and therefore further clarifies his testimony. |

| | | less similar" and I intend to testify to the jury that they were less similar (different) in light of the fact that some used in the California study were contaminated and the three batches resulted in different rates of precipitation. | |
|---|---|---|---|
| p. 141, line 20 | …that's right… | …that's right but there was no evidence that they did… | I believe counsel's reframing of the answer confused what question was being asked. As my report reflects, I intend to testify that "Lena Miller-Jones and her team worked on more than 90 different formulations without the full knowledge of Mileutis," and that is based on the fact that "there was no evidence that they did" inform Mileutis. |
| p. 164, line 5<br>p. 164, line 21 | …yes…<br>…correct… | I wish to clarify that I was responding to the questions insofar as they asked whether Merck engaged in CNH technology development and was working toward validating the technology. Otherwise, the answer would be …no… since my expert opinion is that Merck failed to "collaborate." | I believe counsel's inserting the phrase "during the collaboration" confuses my testimony and seek to clarify here that I do not agree with counsel's statements that Merck collaborated when it failed to do so. |

(Docket Entry No. 141.)

Defendant's opposition does not distinguish or otherwise support the above changes in the Errata Sheet, which would include testimony on Plaintiff's alleged failure to communicate with Defendant, Plaintiff's testing of numerous formulations of CNH, and the tasks completed during

the collaboration.  The Court finds sufficient grounds to grant Plaintiff's unopposed motion to strike these errata for the same reasons consistent with this opinion.[6]  (Docket Entry No. 141.)

**IT IS** on this **28th** day of February, 2023

**ORDERED THAT PLAINTIFF'S MOTION TO STRIKE THE ERRATA SHEET (DOCKET ENTRY NO. 139) IS GRANTED AND DENIED, IN PART; AND IT IS FURTHER**

**ORDERED THAT PLAINTIFF'S MOTION TO STRIKE THE UNOPPOSED CORRECTIVE CHANGES MADE IN THE ERRATA SHEET IS DENIED; AND IT IS FURTHER**

**ORDERED THAT PLAINTIFF'S MOTION TO STRIKE ENTRIES 11:25, 13:2-3, 14:2-17, 31:11, 32:5, 52:20, 53:2, 9, 19, 72:16, 85:20, 97:19, 100:22, 109:7-10, 112:20-21, 137:9-10, 141:20, 164:5, 164:21 IS GRANTED, AS THEY ARE PROCEDURALLY AND SUBSTANTIVELY IMPROPER UNDER FEDERAL RULE OF CIVIL PROCEDURE 30(e).  DR. CONSTANTINIDES' ORIGINAL TESTIMONY SHALL REMAIN PART OF THE RECORD; AND IT IS FURTHER**

**ORDERED THAT THE PARTIES PROVIDE THE COURT WITH A STATUS UPDATE ON DISCOVERY PROCEEDINGS NO LATER THAN MARCH 10, 2023; AND IT IS FURTHER**

**ORDERED THAT THE CLERK OF COURT TERMINATE DOCKET ENTRY NO. 139.**

s/Tonianne J. Bongiovanni
**HONORABLE TONIANNE J. BONGIOVANNI
UNITED STATES MAGISTRATE JUDGE**

---

[6] In addition to there being no opposition to these errata, the Errata Sheet is procedurally deficient, which serves as another basis to reject the proposed changes.  Consequently, the Court finds no further discussion is necessary.